James Talada III
142 Camino Del Sol
Martinez, CA 94553
Telephone: (925) 229-2771

*In Pro Per*



FILED

08 SEP -3 PM 2:26

*[stamp]* U.S. DISTRICT...

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAMES TALADA III,

Plaintiff,

vs.

CITY OF MARTINEZ; MARTINEZ Police
Department; CHIEF DAVE CUTAIA,
Martinez Chief of Police; SERGEANT GARY
PETERSON OR DOE 1, a Martinez Police
Officer; and DOES 2 through 50, inclusive,

Defendants.

2771
Case No.: C08-00574 WHA

**PLAINTIFF'S CASE MANAGEMENT
STATEMENT**

Date: September 10, 2008
Time: 11 a.m.
Dept. Courtroom 9, 19th Floor
Judge: Honorable William H. Alsup

1.    **Jurisdiction and Service**

Defendants removed this case from the Superior Court of Contra Costa County pursuant to 42 U.S.C. § 1441(b) on June 4, 2008. No issues exist regarding personal jurisdiction or venue. All parties have been served and have appeared.

2.    **Facts**

On the morning of Sunday, February 4, 2007 (Super Bowl Sunday), the Plaintiff's girlfriend Melody LaBella was alerted, by her barking dog, to a strange man walking on the vacant, Shell Oil hillside property behind her residence at 142 Camino Del Sol, Martinez, CA. On Monday, February 5, 2007, at approximately 12:30 p.m., the Plaintiff left Melody LaBella's Martinez residence and stopped at the nearby 7-Eleven store on Pacheco Boulevard, to fuel up (had to be at work at 5:00 p.m.) for his trip back to his condominium in Reno, Nevada. At approximately 12:45 p.m., the Plaintiff was driving North on I-680, crossing the Benicia Bridge,

and noticed a burnt orange Mustang with tinted windows behind him. At some point along his trip back to Reno, the Plaintiff suspected that he was being followed by the burnt orange Mustang that he had first noticed on the Benicia Bridge. At approximately 4:00 pm, the Plaintiff arrived at his Reno condominium that he shared with his roommate Terry Geis. The Plaintiff's roommate's father, Gary Geis, was at the condominium when the Plaintiff arrived there. At approximately 4:45 p.m. the Plaintiff walked out of the condominium with Gary Geis to return the rental car the Plaintiff was driving (2008 Black Nissan Maxima), at which point a Reno SWAT Team pulled up beside the Plaintiff, ordered the Plaintiff and Gary Geis down on the ground and placed them in handcuffs. After the Plaintiff was already cuffed and stood-up, a member of the Reno SWAT Team detonated a flash grenade near the Plaintiff (within 10 feet).

The Plaintiff inquired of the Reno SWAT Team if they had detained him because they suspected that he stole the vehicle (rental car) that he was driving. The Reno SWAT Team responded that the Plaintiff would "Need to ask the Martinez Police Department" about why he was being detained. Approximately 1 to 1 ½ hours later, after being handcuffed and taken to the center of the parking lot of his condominium complex, surrounded by the Reno SWAT Team and in full view of his neighbors, the Plaintiff first saw and spoke to Martinez Police Sergeant Gary Peterson. Sergeant Peterson informed the Plaintiff that he represented the Martinez Police Department (at which point the Plaintiff asked Sergeant Peterson what this was "all about"). Sergeant Peterson replied that 'they' (Martinez Police Department) were investigating a sexual assault from 1996. The Plaintiff responded that, in 1996, he had been graduating from college 200 miles away from Martinez. Sergeant Peterson's response as the Plaintiff was being placed into a car for transport downtown to "talk," was, "Well, it doesn't mean you weren't there."

The Plaintiff was then taken to the Reno Police Station and placed in an interview room, with an unknown Martinez Police Officer, while Sergeant Peterson interviewed the Plaintiff's roommate Terry Geis. During this time, the Plaintiff asked the unknown Officer, "Is this the time that I should be asking to call an attorney?" The unknown Officer responded, "You'll have to talk to my boss about that" (referring to Sergeant Peterson of Martinez Police Department). After sitting for approximately three hours in the interview room, the Plaintiff received a visit

from two unknown people (a male and a female). The unknown male (possibly a Police Officer) asked to Plaintiff to remove his shirt. The Plaintiff responded by immediately removing his shirt and turning around to show the unknown man that he had no tattoos, scars or piercings on his body. The unknown male then asked the Plaintiff to show him his left forearm and asked if he had any surgical scars there. The Plaintiff showed his forearm to the unknown male and responded, "No – no surgical scars." The unknown female in the room simply shook her head, "No," and the two left the interview room.

A short time later, (following his interview with Terry Geis), Sergeant Peterson (along with an unidentified member of the Reno Police Department) came into the interview room, and began to casually question the Plaintiff. He remarked that the Plaintiff's roommate was, "A good guy, huh?" "Known each other a long time, have you?", etc. Shortly thereafter, Sergeant Peterson asked Plaintiff if he thought rape, "was a serious crime?", and informed the Plaintiff that he was now going to read him his rights. The Plaintiff responded, "What about the attorney?" To which Sergeant Peterson replied, "What attorney?" The Plaintiff responded, "The Attorney that I asked for a couple of hours ago." Sergeant Peterson responded, "Well, technically, you didn't ask for an attorney." The Plaintiff responded, "Well, technically, then I'm asking for one now." Sergeant Peterson responded, "Why do you need an attorney if you didn't do anything wrong?" The Plaintiff replied, "For something as serious as this, I think I'd better speak to someone." Sergeant Peterson then left the interview room and the Plaintiff did not see him again. The Plaintiff was not read his rights at any time. At between approximately 10 and 11 p.m. that night, the Plaintiff was transported from the Reno Police Station to the Washoe County Detention Facility, never having been read his rights, able to consult counsel or make a phone call.

At the same time back in Martinez, CA, Contra Costa County Deputy District Attorney William M. Clark and Senior Investigator Andrea Moreland arrived at the Plaintiff's girlfriend's (Melody LaBella's) house. Melody's neighbor, Sue Meltzer, was present during the interview. William Clark asked Melody pointed questions about the Plaintiff, including, "Has he recently given you a diamond heart-shaped pendant?" and "Has he ever had money that you didn't expect

1  him to have? To which Melody responded, "No." Andrea Moreland asked Melody "Has he
2  been out of shape recently with like a pot belly?" To which, Melody replied, "No, Jay is a lean
3  guy." William Clark then asked for a physical description of the Plaintiff. Melody responded,
4  "White/Caucasian, clean-shaven, brown hair and eyes and he just weighed himself when he was
5  here this past weekend; he weighed 180 lbs." During Melody's interview, William Clark
6  informed her that the Plaintiff had been under surveillance since the previous weekend. William
7  Clark requested to look through the Plaintiff's belongings. Melody gave them permission to do
8  so. William Clark and Andrea Moreland searched through a closet in Melody's house that
9  contained the Plaintiff's belongings. Upon finishing their search, William Clark asked Melody if
10  he could take two of the Plaintiff's baseball caps. Melody gave William Clark permission to
11  take the Plaintiff's two baseball caps.

12       Upon arrival at the Washoe County Detention Facility, at some time between
13  approximately midnight and 1 a.m., the Plaintiff was taken to a processing area, where he was
14  ordered to shower and had his clothes exchanged for a red jumpsuit (the color given to violent
15  offenders). Just after 1 a.m. on Tuesday, February 6, 2007, the Washoe County Detention
16  Facility Deputy that was escorting the Plaintiff to his cell allowed the Plaintiff to make a phone
17  call, (against procedure, he stated), upon hearing that the Plaintiff had not been allowed to speak
18  to anyone since being taken into custody several hours earlier. At 1:02 a.m., the Plaintiff phoned
19  his roommate Terry Geis on Terry's cell phone. The Plaintiff learned from Terry that their
20  condominium had been sealed and the police would not allow Terry into his own home, so Terry
21  and his father Gary were forced to stay in a nearby hotel.

22       After this brief phone conversation, the Plaintiff was taken to his cell in Special Watch
23  (solitary confinement – no visitors, no calls, no toothbrush). In the early afternoon of Tuesday,
24  February 6, 2007, two previously unseen Martinez Police Detectives, along with a Reno Police
25  Department representative, came to the Plaintiff's cell to secure a DNA sample. The Plaintiff
26  complied and informed the detectives that he had no intention of fighting extradition.

27       Later that Tuesday afternoon, two Reno Detectives returned to the Plaintiff's cell to
28  request permission to search the Plaintiff's condominium and rented vehicle. The Plaintiff

1   consented to both searches, (as the only apparent means of allowing his roommate, Terry Geis,

2   re-entry into their condominium). During the subsequent search later that afternoon, the

3   Plaintiff's roommate, Terry Geis, also consented to a search of his personal vehicle.

4   The Plaintiff remained in solitary confinement until the mid-morning of Thursday,

5   February 8, 2008, when the Plaintiff was brought before a closed-circuit television camera at the

6   Washoe County Detention Facility for his Extradition Hearing (requested by the Martinez Police

7   Department). Because he was dressed in a red jumpsuit (indicating a violent offender), the

8   Plaintiff was hand, waist and ankle cuffed during the video court proceeding. The Plaintiff did

9   not dispute extradition, so the Judge ordered extradition to the Martinez Police Department. The

10  Plaintiff was informed that Martinez had 10 days to pick him up and that there was no bail. The

11  Plaintiff was returned to his cell in solitary confinement until approximately 4 p.m. when the

12  Plaintiff was transferred to a cell in the jail's General Population that he later shared with another

13  inmate.

14  In the early morning on Friday, February 9, 2007, after receiving a notice that his bail

15  was "0," a jail administrator informed the Plaintiff that a "0" bail indicated that he had no bail

16  and the Martinez Police Department had 10 days to pick him up and transport him back to

17  Martinez. At approximately 1 p.m., a jail guard announced on the intercom over the Plaintiff's

18  cell that his warrant was quashed and that he was being released. At approximately 2:20 p.m. on

19  Friday, February 9, 2007, the Plaintiff was released from Washoe County Detention Facility.

20  **3.    Legal Issues**

21  (a)    Whether Defendants City of Martinez and Martinez Police Department failed to

22  adequately train, supervise, evaluate and/or control its officers to prevent their use of excessive

23  force, unreasonable searches and/or other misconduct.

24  (b)    Whether the Defendants breached their duty to use reasonable and due care during

25  the investigation and arrest of the Plaintiff.

26  (c)    Whether the Defendants misused and took advantage of their force and authority

27  as police officers.

28  (d)    Whether the Plaintiff's imprisonment was based on an invalid and incorrectly

Plaintiff's Case Management Statement – C08-00574 – WHA – 5

1   obtained warrant from the Martinez Police Department.

2       (e)     Whether the Defendants caused the Plaintiff to be arrested and imprisoned
3   without reasonable or probable cause.

4       (f)     Whether the defendants used excessive force in their February 5, 2007 arrest of
5   the Plaintiff.

6       (g)     Whether the Plaintiff's Civil Rights were violated.

7       (h)     Whether the Plaintiff suffered damages as a result of being imprisoned by the
8   Defendants.

9   **4.     Motions**

10      Plaintiff anticipates filing a motion to amend his original complaint, once the true names
11  of the unknown defendants (now referred to by fictitious names DOES 11 through 50) are
12  ascertained during the Discovery process.

13  **5.     Amendments of Pleadings**

14      No amendments are expected.

15  **6.     Evidence Preservation**

16      Plaintiff will preserve all potentially relevant evidence.

17  **7.     Disclosures**

18      Plaintiff received the Defendants initial disclosures (their first communication), via
19  courier, on Saturday, August 30, 2008 (Labor Day Weekend), which demanded a response by the
20  close of business Tuesday, September 2, 2008.  On Tuesday, September 2, 2008, Plaintiff filed a
21  "Request for 90-day Extension to Finish Case Management (Alternative Dispute Resolution
22  Program)."  Plaintiff hereby provides the Defendants with his Initial Disclosures.

23  **8.     Discovery**

24      Thus far, the Plaintiff and Defendants have exchanged their Initial Disclosures and have
25  agreed upon a 60-day mediation.

26  **9.     Class Actions**

27      Not applicable.

28  **10.    Related Cases**

Not applicable.

**11.    Relief**

Plaintiff seeks compensation for special damages, as well as general, punitive and exemplary damages according to proof; interest at a legal rate on all sums due; for reasonable attorney's fees as allowed by law and according to proof, if any; for costs of suit and expert fees pursuant to applicable statues; and for such other and further relief as the court deems just and proper. Plaintiff will provide detailed damages and out-of-pocket expenses sought during the upcoming 60-day mediation, which was agreed upon by phone conversation with Defendants' attorneys' Deal and Fitzgerald on the afternoon of Tuesday, September 2, 2008.

**12.    Settlement and ADR**

The parties will conduct whatever settlement and/or ADR procedures the Court deems appropriate.

**13.    Consent to Magistrate Judge for All Purposes**

Following the Defendants removal of this action, it was assigned to this Court for all purposes.

**14.    Other References**

The case is not suitable for reference to binding arbitration, a special master or the Judicial Panel on Multidistrict Litigation.

**15.    Narrowing of Issues**

None.

**16.    Expedited Schedule**

This case cannot be handled on an expedited basis.

**17.    Scheduling**

Plaintiff agrees to the Defendants' suggested schedule, beginning with the Completion of non-expert discovery with a proposed deadline of May 22, 2009 and concluding with a proposed Trial Date of October 26, 2009 (subject to the Court's availability).

**18.    Trial**

The case will be tried to a jury. Trial is estimated to take 8-10 days.

**19.    Disclosure of Non-Party Interested Entities or Persons**

The parties are unaware of any non-parties whose interests could be substantially affected by the outcome of the proceeding.

**20.    Other Matters**

Plaintiff anticipates filing a motion to amend original complaint, once the true names of the unknown defendants (now referred to by fictitious names DOES 11 through 50) are ascertained during the Discovery process.

Dated: September 3, 2008

By:
     James Talada III
     *In Pro Per*

Plaintiff's Case Management Statement – C08-00574 – WHA – 8