Pages 1 - 30

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

```
JAMES TALADA, III,            )
                              )
              Plaintiff,      )
                              )
         v.                   )       NO. CV08-2771 WHA
                              )
CITY OF MARTINEZ et al.,      )
                              )
              Defendant.      )
_____)
```

San Francisco, California
Wednesday, January 14, 2009

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff          Law Offices of John F. Henning, Jr.
Talada                 244 California St., Suite 612
                       San Francisco, CA 94111
                  BY:  **JOHN F. HENNING, JR.**
                       **JOHN F. HENNING, III**


For Plaintiff          Law Offices of Noah W. Kanter
LaBella                1781 Union Street
                       San Francisco, CA 94123
                  BY:  **NOAH W. KANTER**


For Defendant          McNamara, Dodge, Ney, Beatty,
City of Martinez       Slattery & Pfalzer, LLP
                       1211 Newell Avenue
                       Walnut Creek, CA 94596
                  BY:  **NOAH G. BLECHMAN**



Reported By:           CHRISTINE TRISKA, CSR, RPR
                       Pro-Tem Reporter

```
APPEARANCES CONTINUED:

For Defendants        John F. Prentice & Associates
Akeson                2200 Powell St, Suite 740
                      Emeryville, CA 94608
                 BY:  ROBERT D. POSTAR


For Defendant         Low, Ball & Lynch
Guardsmark            505 Montgomery Street, 7th Floor
                      San Francisco, CA 94111-2584
                 BY:  JENNY LI
```

1   Wednesday, January 14, 2009

2                                              2:03 PM

3                     **P R O C E E D I N G S**

4          THE COURT:  Good afternoon, and welcome.  Have a seat.

5          Time is a bit short today, so I'll ask each side to

6   limit themselves to 15 minutes per side, and if there are 45

7   defendants on one side, they've got 15 minutes for the entire

8   group.  So make your best points.

9          All right.  We'll start with Talada versus

10  Martinez, Case Number 08-2771.

11         Who do we have?

12         MR. HENNING:  Good afternoon, your Honor.  John

13  Henning the III, for the plaintiffs.

14         THE COURT:  Henning the III.  Thank you.

15         MR. HENNING, JR.:  John Henning, Junior.

16         THE COURT:  Who?

17         MR. HENNING, JR.:  John Henning, Junior.

18         THE COURT:  You're the second?

19         MR. HENNING, JR.:  Right.

20         THE COURT:  And although they don't ever say the

21  second, do they?

22         MR. HENNING, JR.:  (Nods head.)

23         MR. KANTER:  Noah Kanter for the plaintiff.

24         THE COURT:  You are the first Kanter?

25         MR. KANTER:  I am.  Actually, I am.

1          THE COURT:  What is it?  Kanter?

2          MR. KANTER:  K-A-N-T-E-R.

3          THE COURT:  Kanter the first.  All right.

4          MR. POSTAR:  Good afternoon, your Honor.  Robert

5    Postar for defendants Akeson.

6          THE COURT:  Akeson.  How do you say your last name?

7          MR. POSTAR:  P-O-S-T-A-R, Postar.

8          THE COURT:  Postar.  Okay.  Akeson.  Okay.  And --

9          MS. LI:  Good afternoon, your Honor.  Jenny Li for

10   Guardsmark, Colin Manuel and Charles Parker.

11          THE COURT:  You say, "Guardsmark"?

12          And who is representing Martinez?  They are not

13   part of this motion?

14          MR. HENNING:  They are, your Honor.  It's possible

15   they are late.

16          MR. POSTAR:  They have their separate motions.  We

17   have separate motions.

18          THE COURT:  Your side of the room gets 15 minutes for

19   all the motions.  You each get five minutes.  If they don't want

20   to come here and argue their motions that's their problem.

21          All right.  So let's get started.  Akeson -- the

22   motion first.  You've got five minutes.  Make your absolute

23   best points.

24          MR. POSTAR:  Great.  Thank you, your Honor.

25          THE COURT:  You can be seated.

```
 1              MR. POSTAR:  Your Honor, may it please the Court, the
 2   defendants Akeson are not any of the police defendants in this
 3   extended First Amendment Complaint; they are individuals.  And
 4   first, I wanted to confirm to the Court my understanding from
 5   reading the opposition papers that the plaintiff has withdrawn
 6   the 7th, 8th, 14th, 16th and 18th causes of action against my
 7   clients.
 8              That then leaves a series of causes of action, many of
 9   which have to do with police conduct; for example, false arrest
10   and imprisonment, assault and battery, et cetera.  All of these
11   causes of action have nothing to do with the Akesons.  There are
12   no facts pled against the Akesons.
13              THE COURT:  Are you representing Martinez?
14              MR. BLECHMAN:  Yes.
15              THE COURT:  Your case is already underway.  You can
16   come up here, and you'll have five minutes to make your pitch.
17              MR. BLECHMAN:  Judge, just to let you know, I was next
18   door.  We just got a verdict about ten minutes ago with Judge
19   Breyer, so --
20              THE COURT:  That's great.  Congratulations.  All
21   right.  So what's your name?
22              MR. BLECHMAN:  Noah Blechman on behalf of the City of
23   Martinez.
24              THE COURT:  Have a seat.  Time is very short today, so
25   I have to limit time.  I know what's in the brief, so I just
```

```
 1   want to invite everyone to make their very best points.

 2              Okay.  Continue on, Mr. Postar.

 3              MR. POSTAR:  Thank you, your Honor.

 4              The key to the plaintiffs' case against Cristina

 5   Akeson and apparently David Akeson is the allegation without

 6   substance that Cristina Akeson was the author of an anonymous

 7   letter to the Martinez Police Department.

 8              THE COURT:  That's what was alleged.

 9              MR. POSTAR:  It's alleged --

10              THE COURT:  I can't go without a pleading at this

11   point, can I?

12              MR. POSTAR:  Yes, you can, your Honor, because we

13   requested that the Court take judicial notice of -- among other

14   things, of the arrest warrant which contains information that

15   says --

16              THE COURT:  That's all hearsay.  That's all hearsay.

17   It's all hearsay.

18              What if you asked me to take judicial notice of a

19   declaration filed by Joe Smith in the X, Y, Z versus Smith

20   case in the Alameda Superior Court?  Why is that any

21   different than an affidavit filed by a police officer for a

22   search warrant?

23              MR. POSTAR:  Because the information that we're simply

24   asking the Court to take judicial notice of is the police

25   officer's statement that it's an anonymous letter, which they
```

1  tested for fingerprints and which they could not determine the

2  authorship of.

3           As far as --

4           THE COURT:  That's not going to work.  I'm not going

5  to do that.  Not at the pleading stage.  At summary judgment you

6  may have a very good point.

7           MR. POSTAR:  Thank you.

8           However, moving into the issue of the simple claim

9  that somebody is the author of an anonymous letter, that in

10 and of itself is not a sufficient factual basis to claim that

11 my client, for example, is guilty of --

12          THE COURT:  Just take her deposition.  We're going to

13 find out if she did it or not.  It will be easy.

14          MR. POSTAR:  I understand, your Honor.  However, at

15 this stage in a 12(b)(6) setting the plaintiffs have to allege

16 sufficient facts to even allege a cause of action.  They can't,

17 based upon that --

18          THE COURT:  They said that she wrote the letter.

19          Isn't that enough?

20          MR. POSTAR:  No, it's not, your Honor.  That's a

21 conclusion.

22          THE COURT:  Listen, have you ever looked at the

23 Federal Rules of Civil Procedure?

24          MR. POSTAR:  Yes, I have.

25          THE COURT:  Have you ever looked at the back of it and

```
 1   looked at those -- those short and sweet forms of action?  You
 2   probably haven't.
 3          When you get to be as old and grizzled as I am you
 4   actually have read the book at one point, the complaint for
 5   goods sold and delivered.  Do you see how short that is?
 6   It's only six-lines long -- six -- not even that long.
 7          MR. POSTAR:  I agree, your Honor.
 8          THE COURT:  All right.  So why do they have to do more
 9   than six-lines long because they are alleging that she wrote the
10   letter that was full of misinformation?
11          MR. POSTAR:  Because even a letter that says -- that
12   claims that -- even if they claim that Cristina Akeson wrote a
13   letter accusing Talada of being the serial rapist, that's not
14   enough to create a cause of action against my clients for false
15   arrest, false imprisonment.  There's no allegations that they
16   were involved in arresting or imprisoning.
17          THE COURT:  She was trying to get him arrested.
18          MR. POSTAR:  It's not enough for the cause of action
19   itself.  They are not actors whatsoever in that cause of action.
20          Secondly, there's nothing in that cause of action that
21   even -- let's put it this way; even if Cristina Akeson is
22   alleged to have written this letter, there's no allegation that
23   David Akeson wrote the letter.  Simply being married to someone
24   is not enough to have someone charged with an offense.
25          So first, you have to look at it that there are
```

1  charges against Cristina Akeson.  There are charges against

2  David Akeson.  Some of the allegations against -- causes of

3  action are not against David Akeson.  He's excluded.

4          However, on the ones that he's included, there has

5  to be something tying him to this other than the mere fact

6  that he is married to the lady.  So on that score alone

7  the --

8          THE COURT:  Well, that's a good point.  I'll ask

9  counsel about that.

10          All right.  Your five minutes is almost up.  Make

11  one more point.

12          MR. POSTAR:  All right.  Thank you, your Honor.

13          Moving on to -- we also moved to strike under

14  12(f), and the Court -- we've briefed that issue already with

15  the Court, and I'd like the Court to consider striking as

16  well as dismissing.

17          THE COURT:  All right.  I'll give you a moment later

18  on for rebuttal.

19          MR. POSTAR:  Thank you, your Honor.

20          THE COURT:  Let's hear from the plaintiff on this one.

21          What do you say particularly about David?

22          MR. HENNING:  Your Honor, on the issue of David

23  Akeson, we did allege that he was involved, the extent of which

24  we don't know.  We need discovery.  But it is sufficient under

25  the pleadings to allege that there was civil conspiracy and

1    collusion, and that's under the 15th and 16th causes of action.

2              It may turn out that he was involved, and then at

3    the appropriate time the defendants can move for summary

4    judgment.  But it's premature at this stage, because we don't

5    know exactly how much --

6              THE COURT:  What's going to happen if it turns out

7    that you're wrong about these two, and that they didn't send

8    that letter?

9              MR. HENNING:  Well, we feel very confident that the

10   letter contains facts that only Cristina Akeson would have known

11   about the plaintiff.  And we feel strongly we can tie this to

12   Cristina Akeson after discovery, otherwise we wouldn't be

13   pursuing this.

14             We dismissed -- since this office substituted in as

15   counsel for plaintiffs we have dismissed other defendants, and I

16   agree the First Amended Complaint may be unwieldy, but we have

17   been sifting through them, dismissing defendants and trying to

18   make them --

19             THE COURT:  How many defendants do you have left?

20             MR. HENNING:  It's basically three groups of

21   defendants, and including the individuals it's probably about 16

22   people.  I'm estimating.

23             THE COURT:  There will be some gnashing of teeth, to

24   use a biblical term, if it turns out you're wrong on your

25   allegation.

1          You've been in here suing everybody in site on

2  account that they make the wrong allegation.  If it turns out

3  that you've sued some people without cause you will have some

4  problems of your own.

5          MR. HENNING:  I understand that, your Honor.

6          THE COURT:  All right.  Have a seat.

7          Do you want to say anything by way of rebuttal?

8          MR. POSTAR:  Yes, your Honor.  I want to point out to

9  the Court that in the opposition papers plaintiffs withdrew the

10  15th and 16th causes of action for civil conspiracy.  With those

11  withdrawn, that's the only point that they raised against David

12  Akeson.

13          THE COURT:  Is that true?

14          MR. HENNING:  That's partially true, your Honor.  We

15  withdrew it against all defendants except David Akeson.

16          THE COURT:  What do you say to that?

17          MR. POSTAR:  Well, let's see.  His papers say -- I

18  think his papers are rather ambiguous on this.  Let's see.  He

19  says:

20          "The 15th and 16th causes of action

21          against all defendants except David

22          Akeson."

23          Well, does he mean the 15th and 16th causes of

24  action which were alleged against everybody except David

25  Akeson, or is it only David Akeson --

1          THE COURT:  Well, what does the original document say?

2          Does the complaint allege anything against him?

3          MR. POSTAR:  Only in the sense that he's listed.  But

4    here's the problem:  They've withdrawn their conspiracy charge

5    against all other defendants.  You can't have a conspiracy by

6    yourself.

7          THE COURT:  You didn't say that a while ago.  Now your

8    theory is changing.

9          MR. POSTAR:  Well, the other theory, your Honor, which

10   we spoke about in our moving papers, is David Akeson cannot

11   conspire with himself, and as a result, there can be no

12   conspiracy.  There are insufficient facts.  You have to dismiss.

13         THE COURT:  All right.  Thank you.

14         Let's go to Guardsmark.

15         MS. LI:  Your Honor, I think we briefed the issue

16   pretty well, so I'd just like to submit on the papers.

17         THE COURT:  Music to my ears.  Thank you, Ms. Li.  You

18   are great.

19         On the plaintiff's side do you wish to argue

20   anything against Ms. Li?

21         MR. HENNING:  The only point I'd like to raise, your

22   Honor, in regards to Guardsmark is that -- it was addressed in

23   our papers, but to emphasize, proving negligence in their

24   liability, it can be either *respondeat superior* or also a direct

25   theory of negligence, and we believe both theories were

1  accurately pled.  That's all, your Honor.

2         THE COURT:  What exactly -- just tell me your theory

3  against Guardsmark.

4         MR. HENNING:  Right.  Well, as alleged in the

5  complaint, Guardsmark was on prior notice that Cristina Akeson

6  had engaged in similar harassing behavior at a prior place of

7  employment where she worked.  They alleged they didn't screen

8  her, supervise her --

9         THE COURT:  Let's assume all that is right.

10        Are you saying that Akeson wrote this letter on

11 company time?

12        MR. HENNING:  She -- she wrote it while she was still

13 employed, in January.

14        THE COURT:  Did she write it on company time, or did

15 she write it at home?

16        MR. HENNING:  We'll need to take discovery to find

17 that out.  But, your Honor --

18        THE COURT:  What do you allege?  Do you allege that

19 she did this within the scope of her employment?

20        MR. HENNING:  We do, your Honor, in conjunction with

21 the campaign of harassment and bizarre behavior that she carried

22 out while working for Guardsmark at her place of employment.

23        THE COURT:  Let me ask you a hypothetical.

24        Let's say that somebody works for the City and

25 County of San Francisco, and they -- let's say, they got a

1   job running the daycare center, and they are a little wacko,

2   and the City knows they are a little wacko, but they go home

3   at night, and then they are selling pornography on the

4   Internet.

5          Under your theory the City is on notice that they

6   are wacko, and somehow the City is liable for them selling

7   pornography on the Internet.

8          MR. HENNING:  No, your Honor.  I would submit that

9   this is different.  This is a foreseeability issue.

10  Guardsmark --

11         THE COURT:  Let's say it was foreseeable that they got

12  somebody on the payroll at the City who might be doing something

13  like what you alleged here.  But if it was not done within the

14  scope of employment, why is it any skin off the nose of

15  Guardsmark?

16         MR. HENNING:  Well, it's a factual question for the

17  jury whether it's within the scope of employment or not.  And in

18  the case we have here, Cristina Akeson was engaging in this

19  behavior at work.  It wasn't just a letter.  She was giving sex

20  toys to the plaintiff at work, and this is --

21         THE COURT:  To your plaintiff?

22         MR. HENNING:  Correct.

23         THE COURT:  Did he work there, too?

24         MR. HENNING:  No.  She.

25         THE COURT:  Where did he work?

```
 1              MR. HENNING:  He wasn't -- I'm not clear where he was
 2    working at the time.  He was at a different location from
 3    employment.
 4              THE COURT:  What was he doing at the Guardsmark place,
 5    then?
 6              MR. HENNING:  He wasn't, your Honor.  It's a bit
 7    factually complicated, but the complaint alleges that Cristina
 8    Akeson was basically harassing plaintiff Melody LaBella at their
 9    place of work, and then when she wasn't successful in her
10    romantic pursuit, shall we say, she either took revenge or
11    whatnot by sending this anonymous letter to the police
12    department to have plaintiff Melody LaBella's boyfriend
13    arrested.
14              So the theory against Guardsmark --
15              THE COURT:  Why would Guardsmark be responsible for
16    that?
17              MR. HENNING:  Well, the -- it's why they put in the
18    anti-fraternization policy.  Cristina Akeson, by nature of her
19    interacting with on a daily basis plaintiff Melody LaBella --
20              THE COURT:  LaBella worked there too?
21              MR. HENNING:  Correct, your Honor, but for a different
22    employer.
23              THE COURT:  She worked for Guardsmark?
24              MR. KANTER:  No.  She worked for the sanitary
25    district.  They were a defendant, who was -- we dismissed
```

1    involuntarily.

2            THE COURT:  I'm sorry.  What does Guardsmark have to

3    do with Akeson harassing two plaintiffs?

4            MR. HENNING:  If Guardsmark had adequately screened

5    and done a background check and responded to complaints about

6    Cristina Akeson, Cristina Akeson would have been removed from

7    that job site, such that there would have been no encounters or

8    engagement or discussions with plaintiff Melody LaBella.

9            THE COURT:  But LaBella didn't work at Guardsmark

10   either.

11           MR. HENNING:  LaBella worked at the facility

12   Guardsmark was supposedly protecting.

13           See, Akeson was a security guard for Guardsmark, who

14   was stationed at the Contra Costa Sanitary District, which is

15   where plaintiff Melody LaBella worked at the time.

16           THE COURT:  Did Guardsmark somehow introduce Akeson to

17   the plaintiffs?

18           MR. HENNING:  Well, by virtue of the fact that they

19   stationed her there at that work site such that Melody LaBella

20   engaged -- would see Cristina Akeson on a daily basis, and

21   Cristina Akeson had access to plaintiff's office there.

22           THE COURT:  All right.  Thank you.  Let's hear from

23   Martinez.

24           Do you have a motion to make?

25           MR. BLECHMAN:  Yes, your Honor.  I will be brief also.

1          I was willing to submit on the papers, but I didn't

2     get a call back from their office, so just a couple of quick

3     points.

4          Again, Noah Blechman on behalf of the City of

5     Martinez-related defendants, including Martinez, police

6     department of the City of Martinez, Chief Dave Cutaia,

7     Sergeant Gary Petersen, Commander Mark Smith.

8          First of all, I think in terms of my motion

9     Ms. LaBella's claims and Mr. Talada's claims are distinct and

10    should be viewed as such.

11         There's no facts that indicate there's been any

12    involvement of the City-of-Martinez-related defendants with any

13    of the allegations of Ms. LaBella in terms of the sanitary

14    district, Ms. Akeson, and those related issues, even though the

15    complaint lists all defendants in terms of Ms. LaBella's claims.

16         So I think the Court should look at all of

17    Ms. LaBella's claims, and the Court will see there's no facts

18    that relate to the City-of-Martinez-related defendants.

19    That's point number one.

20         Another point I wanted to make was -- and we put

21    this in our papers, but even though the complaint indicated

22    that it was filed in pro per, as we've indicated before

23    there's been -- it's now been confirmed that the First

24    Amended Complaint was actually drafted by an attorney.  So

25    your Honor should review the complaint with the eyes as if it

1   was drafted by counsel.  I just wanted to make that point

2   also.

3             In addition, with Ms. LaBella, as the Court's well

4   aware, in terms of suing municipal entities there's the

5   Government Tort Claims Act, where claimants need to provide

6   notice to the government entities prior to bringing any state

7   law claims against the entities or any employees of the

8   entities.

9             Ms. LaBella failed to do that, and certainly has

10  failed to allege that, and can't allege it in any subsequent

11  pleadings.  So in essence, all of Ms. LaBella's state law

12  claims will be barred.

13            We made arguments in terms of other individual claims,

14  or federal claims in our papers, so the Court can review that.

15            In terms of Mr. Talada, one of the key issues is the

16  fact that we do have the warrant and did include it, and

17  requested a judicial notice, not on the substance of the

18  warrant, but of the fact that there was a legal document

19  presented to Judge O'Malley, Judge --

20            THE COURT:  Yeah, but -- yes, there was.  There were.

21  There was an affidavit, but how do we know that the affiant

22  didn't just make it all up?

23            See, you want me to just take anything a police

24  officer says as gospel, and I can't do that.  It's got to be

25  proven up in the -- now, I can take judicial notice of the

```
1   fact that the statements were made to the Court.  That's
2   clear; those statements were made to the Court.
3           But it doesn't -- but what if a police officer
4   totally made up the information?
5           MR. BLECHMAN:  Right.  And I understand that
6   predicament, and that what's why we included it simply for the
7   Court to take judicial notice that Judge O'Malley reviewed it,
8   signed it; it was an official document, and that's why
9   Mr. Talada was arrested pursuant to the warrant, because that
10  ties into some of our other arguments, including the qualified
11  immunity arguments --
12          THE COURT:  Are you representing Martinez or Reno?
13          MR. BLECHMAN:  I'm representing City of
14  Martinez-related defendants, not the Reno people --
15          THE COURT:  The Reno people are out.
16          MR. BLECHMAN:  I believe they've been dismissed; yes.
17          THE COURT:  All right.
18          MR. BLECHMAN:  So it ties into my qualified immunity
19  arguments that we arrested Mr. Talada based upon a warrant that
20  was provided to a judge, Judge O'Malley.  She signed it.  At
21  that point we do have --
22          THE COURT:  Which was the police officer that
23  submitted that?
24          MR. BLECHMAN:  That would have been Sergeant, now
25  Commander Gary Petersen.
```

```
 1            THE COURT:  All right.  Now, let's assume for the sake
 2   of argument that he fudged on that and overstated what the real
 3   facts were.  Then wouldn't he be liable if all the other
 4   elements can be met?
 5            I just can't take what he said in there as that he
 6   knew it was completely true, and it was a full and fair
 7   statement of the facts when the other side is saying that he
 8   didn't do all those things.
 9            MR. BLECHMAN:  I understand.
10            THE COURT:  Now, on summary judgment you may have a
11   very strong case, because I'm assuming he'll come in.  He'll
12   march down that affidavit.  He'll say, "Yes, I did this.  Yes, I
13   did that," and Mr. Hemming Number Three and Mr. Hemming Number
14   Two will cross-examine him and try to show that he's a liar, and
15   maybe they'll succeed and maybe they won't succeed.  But by that
16   point in time they better have some proof.  But right now I have
17   to assume that what you're saying in the complaint is true.
18            MR. BLECHMAN:  Well, first of all, we don't believe
19   that the complaint is sufficiently pled in terms of the
20   standards to attack the warrant issued for his arrest and the
21   search warrant.
22            THE COURT:  I don't know.
23            MR. BLECHMAN:  So that's part of the argument.
24            THE COURT:  I'll look at that again, but I am not
25   going to start saying a well-pled allegation is false just
```

 1  because you got a police officer who swore to something.  I know

 2  enough to know that sometimes they make mistakes too.  The Ninth

 3  Circuit would throw that out every day of the week.

 4          MR. BLECHMAN:  Judge, one thing I want to impress upon

 5  you is when we do get the arrest warrant signed by the court, we

 6  then have a duty as officers -- my officer then had a duty then

 7  to --

 8          THE COURT:  What if he knew it was all full of lies,

 9  and then they go in there and they get a judge to sign it, and

10  then they say, "Now, we are now immune from all of our lies?"

11          MR. BLECHMAN:  Not all of the causes of action would

12  relate to that issue.  But certainly some of the causes of

13  action, because of the fact that we did have a properly signed

14  warrant irrespective of the information included in the warrant;

15  a judge reviewed it, found there was sufficient cause, signed

16  the document.  We then have a duty to follow through with that

17  arrest warrant, otherwise there's potential --

18          THE COURT:  On summary judgment you may have a very

19  strong case.  If it turns out that all that information was sort

20  of like the way it comes out in the affidavit -- I'm not going

21  to say yes or no on it -- but then that's much stronger than

22  whatever I have to view this through the 12(b)(6) standard.

23          MR. BLECHMAN:  Okay.  Final point.

24          THE COURT:  You understand the point.  All right.

25  Your five minutes is up.  Thank you.

```
 1              MR. BLECHMAN:  One last point?

 2              THE COURT:  Yes.

 3              MR. BLECHMAN:  The excessive force claim -- I don't

 4   believe it's been sufficiently pled that my clients had any

 5   involvement in the actual physical aspects of the --

 6              THE COURT:  That was the Reno people.

 7              MR. BLECHMAN:  Right.  That was the Reno people.

 8              THE COURT:  I don't see how you can be blamed for what

 9   the Reno -- look, let's say you had a perfectly legitimate

10   warrant, Mother Theresa swore out the affidavit, and then the

11   Reno police executing that beat the guy up.  I don't see how

12   Martinez could be held liable for that.

13              MR. BLECHMAN:  I would agree.  Thank you, your Honor.

14              THE COURT:  Let's hear from Mr. Henning on that.

15              How can you blame Martinez for excessive force in

16   Reno?

17              MR. HENNING:  Your Honor, I think that we can blame

18   them because the arrest warrant -- if the affidavit for the

19   arrest warrant was deficit --

20              THE COURT:  Let's say it was.

21              MR. HENNING:  -- then any force, no matter -- just the

22   fact of putting handcuffs on them --

23              THE COURT:  Mr. Henning, I can't believe that you're

24   saying this.  There's no proximate cause whatever.  If somebody

25   sends -- if Martinez sends out a hold or a warrant, APB or
```

```
 1  whatever they call it, they are entitled to presume that every
 2  police officer who executes that warrant will do so in a lawful
 3  way.  By that I mean not using excessive force.  They are not
 4  supposed to be thinking, "Aha," in addition they are going to go
 5  out and arrest him and they are going the shoot him and they're
 6  going to use excessive force.
 7          MR. HENNING:  Right.  I understand --
 8          THE COURT:  How can you say that Martinez is
 9  responsible?  They could not have foreseen such a thing.
10          MR. HENNING:  Well, I believe our opposition brief
11  cited a case in which it addresses the issue of proximate cause,
12  and says that the fact that someone's being arrested based on a
13  false warrant is enough because there wouldn't have been any
14  physical force applied anyway.
15          THE COURT:  What's the name of that case?  I've got to
16  read that one.
17          MR. HENNING:  I'd have to pull that up, your Honor.
18          THE COURT:  Is that a Ninth Circuit case?
19          MR. HENNING:  It would be -- we have the DeLoach case,
20  which is a Tenth Circuit case, and the Moots case, which is
21  Eleventh Circuit, and that's on page 14 of our opposition to --
22          THE COURT:  All right.  I'm going to look at that.
23  That would be a new -- do you know the years of those decisions?
24          MR. HENNING:  Yes.  They are 1990 and 1987, your
25  Honor, so --
```

1          THE COURT:  Fairly recent.  I've got to look at them.

2          Okay.  What else?

3          MR. HENNING:  Going back to the point brought up by

4  the Akeson defendants on conspiracy, counsel is incorrect in

5  that we have to name more than one defendant in a conspiracy

6  cause of action.

7          The complaint alleges that David Akeson conspired

8  with his wife Cristina.  Just because we dismissed that cause

9  of action for conspiracy and collusion against Cristina

10  Akeson does not mean we are not allowed to bring that cause

11  of action against David Akeson.

12          As far as the point brought up by the Guardsmark

13  defendants and some of the concerns you raised, Guardsmark had

14  in place this anti-fraternization policy to keep the security

15  guards from engaging in personal relationship with their client.

16  So it's not a co-employee type of policy.  It's to keep the

17  guards from engaging in personal banter and relationships and

18  whatnot with the clients that Guardsmark was supposed to

19  protect.

20          THE COURT:  Did Cristina Akeson have a personal

21  relationship with LaBella?

22          MR. HENNING:  Yes.  They developed a friendship over

23  some time because --

24          THE COURT:  Was it romantic?

25          MR. HENNING:  One sided, your Honor, coming from

1   Ms. Akeson.

2            THE COURT:  All right.

3            MR. HENNING:  Moving on in terms of the City of

4   Martinez's points, I think -- I direct the Court to the *Laible*

5   case.  It's cited in our opposition brief, L-A-I-B-L-E.

6            What's significant about that case is it addresses

7   the crux of the issue in terms of the sufficiency of the

8   affidavit for the warrant, and it says that even if an

9   officer gets independent photo identification from a witness,

10  that's not necessarily enough.  The officer still has to

11  investigate to follow up with other witnesses, et cetera,

12  before submitting an affidavit for an arrest warrant.

13           And also it's brought up in our brief, the officer

14  --

15           THE COURT:  Well, you know, I read that affidavit.  It

16  does say that he did all kinds of checking it out.

17           MR. HENNING:  It says that, your Honor, but if you --

18  a closer scrutiny shows that he confirmed the plaintiff's cell

19  phone number.  He confirmed where the plaintiff lived.  That's

20  nice, but it doesn't tie him with being the NorCal rapist who is

21  on the loose.

22           The affidavit left out the fact -- it makes hay of

23  saying Mr. Talada changed his cell phone provider right after

24  this press conference, but the officer left out the fact that

25  the plaintiff's phone number stayed the same.  In other

1   words, he wasn't -- the officer was trying to give this

2   impression that the plaintiff was somehow avoiding police

3   scrutiny or on the run, et cetera.

4           He had the same telephone number for years.  That

5   was left out.  And under *Laible* and the other cases cited in

6   our brief, just leaving out critical facts like that is

7   enough for a jury to look at a false arrest claim.

8           And also, the officer left out in its affidavit the

9   fact that there were 30 other tips that were brought, I believe,

10  to the Sacramento Police Department on this rapist, none of

11  which he checked out.  He told the judge that this was the only

12  tip he received, and --

13          THE COURT:  That's in the affidavit?

14          MR. HENNING:  Correct, your Honor.

15          THE COURT:  That's in the affidavit that, "This is the

16  only tip I received"?

17          MR. HENNING:  Correct.

18          THE COURT:  Where did you get the information that

19  there were 30 others?

20          MR. HENNING:  It's in a newspaper article that was

21  attached as an exhibit to the affidavit.

22          THE COURT:  I have an idea.  I want to change the

23  subject.

24          I think what would be very useful for this case is

25  a one-hour deposition of both plaintiffs, and a one-hour

1    deposition of Cristina and the husband.  That's what I think.

2          Can we do that next week?

3          MR. HENNING:  Your Honor, if I could bring up a point.

4    The defendants, while they were pro per were --

5          THE COURT:  This is without prejudice to bring other

6    depositions later.  All right.

7          What do you say to that idea?

8          MR. HENNING:  I really prefer, your Honor, to do a

9    full deposition of Ms. Akeson.

10         And also, the problem timing-wise, depositions

11   usually tend to be more helpful and meaningful after we've

12   obtained more documents.

13         THE COURT:  I'm going to let you have that later.  You

14   can have that later.  In other words, this one hour would just

15   be a free look at what the other side has to say.  But you've

16   got to say --

17         MR. HENNING:  We'd be agreeable to that, your Honor,

18   of course.

19         THE COURT:  How about over there?  Who represents the

20   Akesons?

21         MR. POSTAR:  I do, your Honor.

22         THE COURT:  What do you think of that idea?

23         MR. POSTAR:  Your Honor, after we've had your ruling

24   and see what's left we have no objections --

25         THE COURT:  No.  I'm talking about you -- can you do

1    it next week?

2            Let's assume you lose.

3            MR. POSTAR:  Yes.

4            THE COURT:  What do you say to that idea?

5            I think a lot of things would come out, and you

6    two -- and both sides are going to wind up saying things that

7    they regret under oath, and that'd be the end of the case

8    both ways.

9            MR. HENNING:  Your Honor, if I may, the plaintiff --

10   plaintiff James Talada was deposed for I believe a full day by

11   the defendants.

12           THE COURT:  Already?

13           MR. HENNING:  Yes.

14           THE COURT:  All right, then.  This one hour wouldn't

15   apply to him.  How about LaBella?

16           MR. HENNING:  She has not been deposed, your Honor.

17           THE COURT:  One hour there and one hour for each.

18           MR. POSTAR:  Well, we have no chance to weigh in on

19   Mr. Talada because it was taken up by the City of Martinez.

20           THE COURT:  It's okay.  You can still have your shot.

21           I just think in a case like this it's very useful

22   to get people under oath as soon as possible.

23           MR. POSTAR:  I'm free Wednesday, Thursday and Friday.

24           THE COURT:  Next week?

25           MR. POSTAR:  Next week.

```
 1              THE COURT:  All right.  Thursday.  How about Thursday?
 2  Your two people show up at 9 o'clock.  Are your offices here in
 3  San Francisco?
 4              MR. POSTAR:  Emeryville, your Honor.
 5              THE COURT:  Where are you located?
 6              MR. HENNING:  San Francisco, your Honor.
 7              THE COURT:  Your office is in Emeryville.  They get to
 8  take your two people at 9 o'clock and 10 o'clock respectively --
 9  one hour each.  You don't have to produce any documents ahead of
10  time, because they are going to get all that later on anyway.
11  Then you get to take the deposition of LaBella at his office the
12  next day at 9 o'clock.
13              MR. POSTAR:  That'd be on the 23rd, your Honor?
14              THE COURT:  I don't know.  23rd is a Friday.
15              MR. HENNING:  That's fine with us, your Honor.
16              MR. POSTAR:  Do we also get Talada or not?
17              THE COURT:  No.  He's already been deposed for an
18  hour -- I mean, a day.  You'll get your shot at him later on.
19  He's already under oath for eight hours.  I'm talking about just
20  one hour to have a therapeutic effect on the case.
21              MR. POSTAR:  Okay.  That sounds great, your Honor.
22              So the depositions of my clients will be at my
23  office, and counsel will take them --
24              THE COURT:  I'm going to appoint you as the lead
25  counsel to take the deposition for one hour of LaBella.  This is
```

1  without prejudice to everybody getting their shot at more

2  depositions later on.

3          MR. POSTAR:  Okay.  In terms of who pays for the

4  deposition --

5          THE COURT:  Each side is going to have to pay for --

6  whoever is taking it is going to have to pay for it.

7          MR. POSTAR:  Thank you, your Honor.

8          MR. HENNING:  Thank you.

9          THE COURT:  Under submission.

10          MR. POSTAR:  Submitted, your Honor.

11          (The proceedings concluded at 2:38 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### CERTIFICATE OF REPORTER

I, CHRISTINE TRISKA, Pro-Tem Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in CV08-2771, Talada versus City of Martinez et al were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____/S/ Christine Triska_____

Christine Triska, CSR 12826, CSR, RPR

Wednesday, July 22, 2009