IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES TALADA, III, and MELODY LABELLA,<br><br>    Plaintiffs,<br><br>  v.<br><br>CITY OF MARTINEZ, *et al.*,<br><br>    Defendants.<br>_____/ | No. C 08-02771 WHA<br><br>**ORDER REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

This order grants summary judgment in favor of defendant Gary Peterson and grants in part and denies in part summary judgment for defendant Cristina Akeson, for the following reasons.

**STATEMENT**

This action arises from the arrest and subsequent release of plaintiff James Talada, a man incorrectly identified as the infamous NorCal rapist by an anonymous police informant whom plaintiffs allege was defendant Cristina Akeson. The NorCal rapist was alleged to have raped numerous women in Northern California beginning in the 1990's. All of the parties agree that Talada was cleared and was not the NorCal rapist.

On November 14, 2006, the Sacramento Police Department appealed to the public for information regarding possible NorCal rapist suspects. At the press conference, the NorCal

1   rapist was described as a 37 to 40 year-old man, between five feet, eight inches and six feet in
2   height, weighing between 200 to 240 pounds, with a pot belly.

3         In January 2007, the City of Martinez Police Department received by mail an
4   anonymous typed letter addressed to defendant Sergeant Mark Peterson. Enclosed with the
5   letter were news article dated November 16, 2006, and titled "Serial rapist leaves new clues for
6   police," two photographs, and an addendum to the letter. After receiving the letter, Peterson
7   conducted an investigation of its contents. He sent the contents to forensics, but no fingerprints
8   were obtained. The letter identified James "Jay" Talapia as the NorCal rapist. A search for that
9   name provided no results, but revealed James Talada, our plaintiff. According to California
10  DMV records, Talada was 37 years old and five feet, ten inches tall. Peterson compared the
11  DMV photo of Talada and a photo obtained of the suspect wearing a hard, opaque mask and
12  determined that they looked very similar. After his investigation, Peterson formed the opinion
13  that the anonymous letter was credible. On February 2, 2007, Peterson submitted an affidavit to
14  Judge Mary Ann O'Malley of the Contra Costa Superior Court. She read the entire affidavit.
15  On February 5, 2007, Judge O'Malley signed and issued the search and arrest warrants.

16        Peterson made arrangements for surveillance of Talada's Martinez address. As the
17  anonymous letter had predicted, a rental car was parked in his driveway. Peterson contacted the
18  rental car company, who informed him that Talada rented the car in Reno, Nevada.
19  Surveillance teams followed Talada from Martinez to Reno, with Peterson trailing behind.
20  Peterson instructed one of the agents to request the Reno police to take Talada into custody
21  pursuant to the arrest warrant. That same day Talada was arrested in Reno and held in a jail
22  there. Peterson asked the Reno police to take a DNA swab from Talada, but Talada refused to
23  submit to the test. Peterson met with a deputy district attorney at the Reno Police Department
24  and determined that they could obtain a DNA sample from Talada while he was in custody.
25  Peterson then instructed a detective to collect a DNA swab from Talada. Talada submitted to
26  the test, and the swab was taken. The Contra Costa County Police, however, notified Peterson
27  that Talada's DNA did *not* match that of the NorCal rapist. Peterson then called the Reno jail
28

and advised them that the charges against Talada were being dropped and that he should be released. He was.

Our other plaintiff is Melody LaBella, who was involved in a personal relationship with Talada for some time. She asserts a different set of claims (she was never arrested) but those claims involve Akeson as well. LaBella and Talada lived together in Martinez. In November 2006, LaBella and Talada had problems with their relationship, and LaBella requested that Talada move out. He later moved back in around March 2007.

LaBella worked as an engineer for the Central Contra Costa Sanitary District ("CCCSD"), who outsourced security personnel from Guardsmark GP, LLC. One such outsourced guard was defendant Cristina Akeson. While at CCCSD, Akeson and LaBella became friends. Akeson later allegedly sexually harassed and defamed LaBella. This included Akeson giving LaBella gifts, including sex toys and dolls, and decorating her office with flowers. This was all in supposed violation of Guardsmark's policy against fraternization between CCCSD employees and security personnel. LaBella later cut off all social contact with Akeson around December 2006.

Plaintiffs allege that a month later Akeson sent the anonymous letter to the Martinez Police Department falsely reporting that Talada was the NorCal rapist. Akeson also allegedly sent an anonymous letter to LaBella's supervisor saying that plaintiffs were under investigation for theft, fraud, rape, and murder. In May 2007, LaBella received an anonymous letter by mail that was addressed to her and contained craigslist postings and newspaper clippings. The contents again referred to theft, murder, and sexual predators, but it did not specifically mention either plaintiff by name. The letter came in an envelope from the *Contra Costa County Times*, where plaintiffs contend Akeson formerly worked. Soon thereafter, LaBella obtained a state court restraining order against Akeson.

Almost a year later, plaintiffs brought this action. In their first amended complaint, Talada and LaBella, alleged 25 claims against 39 named defendants and 100 unnamed Does. Of the 39 named defendants, 36 have been dismissed from this action pursuant to stipulations between the parties. The claims asserted against defendant David Akeson, Cristina Akeson's

3

husband, were dismissed without leave to amend in an order dated February 12, 2009 (Dkt. No. 130). That order also dismissed several claims against various defendants, and plaintiffs subsequently filed an amended complaint.

The only remaining defendants include Gary Peterson, the officer who obtained the warrants, and Cristina Akeson, who allegedly wrote the anonymous letters. The parties have stipulated to dismiss several claims previously asserted against Peterson and Akeson. All that remains in Talada's suit against Peterson, are claims for deprivation of his civil rights, in violation of 42 U.S.C. 1983 and 1988 and the California Constitution, as well as false arrest/imprisonment and conversion, in violation of California law. Talada also asserted a false arrest/imprisonment claim against Akeson. Against Akeson, both Talada and LaBella asserted claims for intentional infliction of severe emotional distress and defamation. LaBella has also brought a claim against Akeson for violation of her civil rights under California Civil Code § 52.1.

**ANALYSIS**

Summary judgment is granted under FRCP 56 when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." A district court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there is any genuine issue of material fact. *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 872 (9th Cir. 2007). A genuine issue of fact is one that could reasonably be resolved, based on the factual record, in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).[1]

**1.  DEFENDANT PETERSON'S MOTION FOR SUMMARY JUDGMENT.**

As to defendant Peterson, the main question is whether the search and arrest warrants were supported by probable cause. This order holds that Peterson had probable cause to obtain

---

[1] Unless otherwise indicated, internal citations are omitted from quoted authorities.

4

search and arrest warrants based on corroboration of the anonymous informant letter and his independent police work. Therefore, all claims against him must be dismissed.[2]

### A.  Section 1983 and 1988 Claims.

Talada asserts a claim for relief under Section 1983 and 1988 based on his allegation that no probable cause existed for issuance of the search and arrest warrants. The Fourth Amendment prohibits searches and arrests without probable cause. For reviewing the sufficiency of an affidavit in support of a warrant, the Supreme Court has provided the following guidance:

> [W]e reaffirm the totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations. The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 238–39 (1983). "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity . . . innocent behavior frequently will provide the basis for a showing of probable cause." *Id.* at 245 n.13.[3]

#### (1)  Corroboration of Anonymous Letter.

The totality of the circumstances indicate that the warrants here were supported by probable cause. An anonymous letter identified James "Jay" Talapia as the NorCal rapist. Peterson relied on the letter and independent police work in seeking the warrants at issue.

---

[2] Defendant Peterson also moves to strike plaintiffs' late filing of their opposing papers. Despite plaintiffs' untimely request, the Court previously granted an extension of time for plaintiffs to file their opposition. The deadline was set as August 17, 2009, at noon. But without an explanation or showing of good cause, plaintiffs did not file their opposition and a supplemental declaration until August 18, 2009, at almost midnight. The Court subsequently granted defendant Peterson an extra day to respond. Therefore, any prejudice was mitigated, and defendants' motion to strike is **DENIED**.

[3] Section 1983 "creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *See Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). Plaintiffs amended their complaint and failed to assert any federal constitutional claims. Apparently, plaintiffs misunderstood the Court's order dismissing parts of the complaint. The Fourth Amendment claim was only dismissed to the extent plaintiffs alleged violations regarding excessive force. The Fourth Amendment claim regarding a violation based on an unlawful search and arrest was not dismissed. Therefore, this order addresses the Fourth Amendment claim regarding the search and arrest.

1    Assessing the reliability of hearsay information, such as an anonymous letter, is one part of
2    determining whether probable cause exists for the issuance of a warrant.  An anonymous tip,
3    without more, does not constitute probable cause.  But if there are also sufficient indicia of
4    reliability, then probable cause may be established based on a tip from an anonymous
5    informant.  *Id.* at 233–34, 243–46.  Such indicia may include a detailed description of the
6    alleged wrongdoing that the informant witnessed first-hand, the provision of details not easily
7    obtained or predicted, or the police's ability to corroborate the information.

8    Peterson corroborated much of the information provided in the anonymous letter
9    through independent sources.  And "[i]t is enough, for purposes of assessing probable cause,
10   that corroboration through other sources of information reduced the chances of a reckless or
11   prevaricating tale, thus providing a substantial basis for crediting the hearsay." *Id.* at 244–45.

12   Peterson conducted a DMV records search and located Talada's California Driver's
13   License.  DMV records indicated that Talada was a Caucasian male who was five feet, ten
14   inches tall, with brown hair, and 37 years old.  His weight was listed at 175 pounds.  According
15   to the victims' description of the NorCal rapist, he was a Caucasian male with a height between
16   five feet, ten inches and six feet, with blonde to brown hair, and between 37 to 40 years old.
17   The NorCal rapist was also described as being 200 to 250 pounds with a noticeable pot belly.
18   Although the weight was off, the race, height, hair color, and age were a close match.

19   The anonymous letter also identified Concord, Martinez, and South San Francisco as
20   cities where Talada previously lived.  Peterson conducted address checks and verified that
21   Talada previously had mailing addresses in each location.  It also stated that Talada visited
22   South San Francisco frequently, and the DMV history check showed that Talada was cited in
23   South San Francisco in 1998 for driving violations.

24   Contrary to plaintiff's assertion, the informant letter identified more than pedestrian
25   facts, such as the suspect's residence.  Peterson also verified that Talada had been a student at
26   Chico State, as the letter stated.  Talada had been a student there from 1993 through 1997, and
27   one of the rapes occurred in Chico in 1997, at a location only 1.4 miles away from Talada's
28

Chico address. According to the letter, Talada was a daily alcohol drinker, and a records check revealed that Talada was cited for a DUI on a bicycle by the Chico Police Department.

Peterson did not just rely on the informant. He also consulted with Laurie Jasienczyk, a Special Agent Supervisor/Criminal Profiler with the California Department of Justice. After reviewing the cases of the serial rapist, Jasienczyk concluded that the suspect was a classic under-achiever who had technical skills but could not keep a job because he did not like being told what to do. In conformity with that profile, the letter stated that Talada was a computer hacker and had not worked in years.

Talada now assails Peterson's investigation and corroboration as "shoddy" and a "sham." The affidavit failed to acknowledge, he says, that the letter writer was mentally disturbed and malicious and the allegations of marijuana harvesting and computer hacking in the letter were not corroborated. Because the letter came from an anonymous informant, Peterson had no basis to conclude the writer was mentally disturbed and malicious. Peterson acted properly when he relied on the information from the anonymous informant and was under no obligation to absolutely verify all of the information provided. Peterson's duty was to establish a "fair probability," which he successfully did. *Gates*, 462 U.S. at 238. Taken as a whole, the facts presented to Judge O'Malley supported the tip and provided a substantial basis for concluding that probable cause existed.

*(2)     Alleged Material Misrepresentations and Omissions.*

Talada asserts that Peterson made numerous material misrepresentations and omissions in his application for the search and arrest warrants. For the proposition that a search and arrest based on warrants secured with false statements or misleading omissions is unconstitutional, Talada relies on *Franks v. Delaware*, 438 U.S. 154 (1978). In that decision, the Supreme Court stated that to challenge the validity of a warrant

> There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

7

1  *Franks*, 438 U.S. at 171.  Contrary to Talada's contentions, there is no proof of deliberate
2  falsehood or reckless disregard for the truth here.

3    *First*, Talada contends (Opp. 4–5) that Peterson did not inform Judge O'Malley, the
4  judge who issued the warrants, that the NorCal rapist in the ATM photo was wearing a hard,
5  opaque plastic mask.  This is plainly inaccurate.  And even plaintiff seems to acknowledge this
6  by citing in their opposition to page 21 in Peterson's affidavit and quoting the language that
7  described the ATM photo and that stated the suspect was wearing "a hard, opaque plastic mask
8  with what appeared to be a normal face" (Opp. 5).  The affidavit also explained that "the ATM
9  camera had captured images of the suspect wearing a clear or opaque mask" and that exhibit D
10 to the affidavit included copies of the ATM photo images of "the suspect wearing a clear or
11 opaque mask" (Peterson Exh. E at 20–21).    At the hearing, the Court inquired on this point.
12 Talada's counsel represented that he was relying on paragraph 42 of Peterson's declaration,
13 which stated (in full):

> On 2/5/2007, at approx. 12:50 p.m., I met with Honorable Mary
> Ann O'Malley.  Judge O'Malley reviewed the affidavit in its
> entirety and pointed out the similarity between Talada's DMV
> photo and the ATM photographs of the suspect.  Judge O'Malley
> then signed the warrant authorizing the arrest of Talada and
> seizure of cells containing his DNA.

Contrary to Talada's representation, this evidence — expressly adopted by Talada — directly contradicts the conclusion "that she believed James Talada resembled not a person, but rather only a mask" and Peterson's failure to inform the judge was actionable.  The affidavit repeatedly stated (Peterson Exh. E at 20–21) that the ATM photographs showed the culprit wearing a face mask.  Paragraph 42 plainly stated the judge read the affidavit.  The Court is disappointed in counsel for trying to distort the factual record so grotesquely.  True, the ATM photo involved a *masked* suspect and the DMV photo did not, but Peterson did *not* hide this fact as counsel argues, but affirmatively disclosed it in his sworn affidavit.

    *Second*, plaintiff argues that Peterson failed to inform Judge O'Malley that there was no connection between Talada and the Toyota Forerunner used by the suspect in a 2006 rape.  The affidavit did not specifically address the absence (or presence) of a vehicle connection.  This was very minor.  Of course, if Talada's vehicle had been at the scene of the crime it would have

8

been powerful evidence, but its absence was virtually meaningless, for any rapist would have been highly unlikely to have used his own automobile in such a crime. The affidavit referred to the Toyota Forerunner in the newspaper clipping attached to it and did not affirmatively suggest there was a connection (Peterson Exh. E at 47). There is no evidence that Peterson failed to mention the lack of a connection because of deliberate falsehood or reckless disregard for the truth. This is another phony issue.

*Third*, plaintiff complains that Peterson did not point out that Talada had dark brown hair and the NorCal rapist had blond or light brown hair. Again, this mischaracterizes the record. The affidavit *did* contain a description of the hair colors of both the suspect and Talada (*compare* Peterson Exh. E at 15 (affidavit noting victims' descriptions of suspect's hair ranged from blond to brown) and Peterson Exh. E at 15, 48 (affidavit attaching Talada's DMV record identifying his hair as brown)). Plaintiff further complains that the affidavit did not distinguish between the suspect's "fine" hair as described by one victim and Talada's "thick and full" hair as shown in Talada's photographs obtained by the Martinez police. Again, the affidavit, indeed included the victim's description of the rapist and a headshot of Talada for the judge's review. There was no material misrepresentation or omission.

*Fourth*, plaintiff argues that the affidavit did not include full size police sketches of the suspect. While full size sketches were not provided, the officer provided the judge with smaller sketches as part of a newspaper article attached to the affidavit (Peterson Exh. E at 47). Again, there was no material omission.

*Fifth*, plaintiff complains that Peterson falsely claimed that Davis was in a "driving corridor" between Chico and the Bay Area and instead argues that Davis was farther to the east. The affidavit noted that the anonymous letter stated Talada frequently visited South San Francisco, and he further learned that Talada at one point had a home address in South San Francisco. In an attempt to connect Talada with rapes committed in Davis, the affidavit noted that a "common method to drive from S. San Francisco to Chico would involve I80 to either 113 through Davis or N on I5, which would also take one through Davis" (Peterson Exh. E at

9

1    12). While there were several possible routes between the two areas, at least one of those routes
2    would have been close enough to Davis to be fairly described in the affidavit.

3        *Sixth*, the informant letter stated that Talada's mother's name was Penny, and the
4    affidavit stated that "Penny" and "Peggy" were nicknames for "Margaret." Peterson located a
5    Margaret Talada born in 1955 and who at one point shared an address with Talada. Arguing
6    there was no evidence showing that this woman was Talada's mother, plaintiff asserts that
7    Penny was not a nickname for Margaret and that the located woman would have been only
8    14 years old when she had Talada, who was born in 1969. There is no evidence showing that
9    Peterson, with deliberate falsehood or of reckless disregard for the truth, provided this
10   information in his affidavit. At most, he made an innocent mistake. "Allegations of negligence
11   or innocent mistake are insufficient." *Franks*, 438 U.S. at 171. Regardless, these facts are not
12   material. Omitting this information from the affidavit, there remains probable cause for the
13   warrant.

14       *Seventh*, Talada asserts that Peterson did not inform Judge O'Malley that Talada did not
15   switch his phone number despite changing service providers. This argument is unavailing. The
16   affidavit confirmed that the phone number provided by the informant belonged to Talada and
17   merely stated that in November 2006, Talada downloaded his three different telephone numbers
18   from Metro PCS to Cingular Wireless (Peterson Exh. E at 12). There was no factual
19   misrepresentation. The alleged omission was inconsequential and had no effect on the proper
20   determination of probable cause.

21       *Finally*, Talada suggests several other alternative investigative measures that Peterson
22   could have performed. For example, plaintiff contends that Peterson did not have the victims
23   identify Talada by photo, did not interview LaBella for corroboration, and did not ask Talada
24   for a voluntary DNA sample. Peterson's role was to collect evidence to show a "fair
25   probability" that evidence of a crime could be found from a search. *Gates*, 462 U.S. at 238.
26   Failing to interview all possible witnesses is not intentionally or recklessly including a false
27   statement in an affidavit. In addition, alerting Talada or LaBella to the investigation prior to the
28   arrest could have risked the suspect fleeing or the destruction of evidence. While plaintiff has

10

1  outlined things Peterson did not do, the fact is that Peterson did do several things and those
2  were enough to support probable cause. "After-the-fact scrutiny by courts of the sufficiency of
3  an affidavit should not take the form of *de novo* review. A magistrate's determination of
4  probable cause should be paid great deference by reviewing courts." *Id.* at 237.[4]

5  The decisions cited by Talada are inapposite. Those decisions involve situations where
6  the officers misled the magistrate judge with material statements the officers knew or should
7  have known were false or omitted material information from their affidavits (Opp. 13–14). *See
8  e.g.*, *Miller v. Prince George's County*, 475 F.3d 621, 632 (4th Cir. 2007) (officer knowingly
9  stated suspect was a Caucasian male even though he was African-American); *Burke v. Town of
10 Walpole*, 405 F.3d 66, 86 (1st Cir. 2005) (officer omitted fact that DNA evidence showed there
11 was no match to the crime); *DeLoach v. Bevers*, 922 F.2d 618, 624 (10th Cir. 1990) (detective
12 mischaracterized material evidence and omitted the opinion of a key medical expert); *Laible v.
13 Superior Court*, 157 Cal. App. 3d 44, 52 (1984) (officer failed to follow-up with witnesses
14 suspect identified for alibis and omitted evidence regarding money discrepancy).

15 None of the purported "misrepresentations" or "omissions" here was material. Plus,
16 Talada has provided nothing to support his assertions that there were deliberate fabrications.
17 Even excluding the information from the affidavit that Talada claims was a fabrication, and
18 adding information that Talada contends should have been included, there was probable cause
19 for the search warrant. *See Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1295
20 (9th Cir. 1999) (to survive a summary judgment motion in a Section 1983 claim for a Fourth
21 Amendment violation, a plaintiff must establish that, excluding the alleged false statements in

---

[4] Plaintiffs have filed a declaration and an untimely supplemental declaration from Peter Siragusa, a purported expert, in support of their oppositions to defendants' motions. Defendant Peterson moves to strike the declarations and objects on the following grounds: (1) he is not qualified to testify as an expert under FRE 702, because plaintiffs failed to lay a proper foundation to qualify him as an expert; (2) his report is inadmissible hearsay because it was based on information obtained from discussions with plaintiffs' counsel; and (3) his report is based upon improper speculation and legal conclusion. A proper foundation has not been set forth to qualify Siragusa as an expert. The declaration contains a short paragraph labeled as the witness's qualifications, stating he was previously a police officer and worked in sex crimes and providing dates. But this is not sufficient to establish his qualifications based on knowledge, skill, experience, training, or education under FRE 702. A resume, although referenced, was not attached to the declarations. Even if his declarations were not stricken, both contain speculative conclusions and spotlight "omissions" that are not material as explained by this order, nonetheless, addressing related arguments made in the opposition. Because of the many deficiencies in Siragusa's report, defendant's motion to strike Siragusa's declarations is **GRANTED**.

1  the affidavit and including the alleged wrongfully omitted information, the search warrant
2  lacked probable cause). Peterson recited in his affidavit the bases for the warrant, and Judge
3  O'Malley deemed the affidavit sufficient to support the warrants for the search and arrest.
4  There was probable cause to believe that Talada was the NorCal rapist and that evidence would
5  be found in his residence. Accordingly, there was no violation of the Fourth Amendment.

### B. Qualified Immunity.

Alternatively, Peterson maintains that because the warrants were obtained based on probable cause, he is entitled to summary judgment on the issue of qualified immunity. This order agrees. A determination as to an officer's entitlement to qualified immunity involves a two-pronged inquiry. *First*, a determination whether the facts, viewed in the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a constitutional right. If no right would have been violated on the facts set forth, there is no need for further inquiry into immunity. *Second*, if a constitutional violation can be established, courts next inquire whether the right was clearly established in the specific context of the case, rather than as a broad general proposition. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Pearson v. Callahan*, 129 S. Ct. 808, 813 (2009) (stating that the *Saucier* procedure should not be regarded as an inflexible requirement). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." 533 U.S. at 202.

As stated above, Talada cannot show a violation of his constitutional rights. Under *Saucier*, the inquiry into qualified immunity need go no further, and Peterson is entitled to judgment on the Section 1983 and 1988 claims. *Id.* at 201.

### C. Talada's State-Law Claims.

The state-law claims asserted against Peterson in this action include false arrest/imprisonment, conversion, and a violation of civil rights under the California Constitution. All of these claims stem from Talada's allegations regarding an unlawful search and arrest. As stated above, the arrest and search warrants were based on probable cause, so the state-law claims also fail. *See Hart v. Parks*, 450 F.3d 1059, 1071 (9th Cir. 2006).

### D.      Arrest in Nevada.

Talada was arrested in Reno. But an arrest warrant was issued only in California. Citing *Engelman v. Deputy Murray*, 546 F.3d 944 (8th Cir. 2008), Talada argues that the arrest warrant was not valid outside of the state jurisdiction where it was issued. Essentially, Talada contends that the California officer, Peterson, violated Talada's rights because he was arrested in Nevada on a California warrant.

In *Engelman*, the plaintiff alleged that an Arkansas deputy violated his Fourth Amendment rights by arresting him in Oklahoma on an Arkansas warrant. When analyzing the issue, the Eighth Circuit stated the following:

> Under a historical understanding of the Fourth Amendment, the jurisdiction of the issuing judge and the executing officer is limited, and a warrant is not valid if an officer acts outside of that limited jurisdiction. Moreover, the Constitution explicitly provides a procedure for extradition between states, suggesting that an officer from one state may not simply cross into another state to arrest an individual. *See* U.S. Const. art. IV, § 2 ('A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.').

*Engleman v. Deputy Murray*, 546 F.3d 944, 948–49 (8th Cir. 2008). Because the officer in *Engelman* was summoned to a location with an Arkansas mailing address and the 911 call originated from an Arkansas telephone number, the officer had an objectively reasonable, although mistaken, belief that he was executing the arrest in Arkansas instead of Oklahoma. Based on that objectively reasonable belief, the Eighth Circuit held that the arrest did not violate the Fourth Amendment even though it was effected outside the deputy's jurisdiction. In contrast to the officer in *Engelman*, *significantly, Peterson did not actually execute the arrest warrant outside his California jurisdiction. The Reno police arrested Talada.* Talada chose to settle and dismiss all of his claims against the Reno defendants early on herein (Dkt. No. 83). This argument is directed at the wrong defendant. In any event, plaintiff has not pointed to any evidence that Peterson did not have an objectively reasonable belief that the warrant supported an arrest in Nevada. *See People v. McGraw*, 226 Cal. App. 3d 346, 350 (concluding the arrest

13

and search were valid based on a Washington state warrant executed by officers in California who had an objectively reasonable belief that its validity would apply).

It is unfortunate that Talada was mistakenly arrested, and it is understandable why an innocent citizen, like Talada, would feel wronged by the actions of an officer, such as Peterson, who made a mistake. While an officer cannot recklessly or knowingly violate a citizen's rights, he may act in an objectively reasonable and diligent manner in pursuing reasonable suspicion to apprehend a suspect. An officer, however, acting in good faith should not have to fear litigation or monetary damages if their conduct is objectively reasonable under the circumstances. We depend on such police work to protect society from rapists and other criminals. *See Alexander v. County of Los Angeles*, 64 F.3d 1315, 1322 (9th Cir. 1995). Under the circumstances here, including the corroboration of the anonymous letter and the independent police work, it cannot be said as a matter of law that Peterson's conduct was not objectively reasonable in trying to protect the public from a vicious serial rapist. Accordingly, defendant Peterson's motion for summary judgment is **GRANTED**.

**2.     DEFENDANT AKESON'S MOTION FOR SUMMARY JUDGMENT.**

**A.     Evidentiary Objections.**

Akeson asserts numerous evidentiary objections to the exhibits plaintiffs' rely on to support their claims against her. The exhibits at issue — emails and anonymous letters — are attached to LaBella's declaration, and the declaration merely states that the attached exhibits are true and correct copies. The objections are based on assertions of hearsay, lack of relevancy and authentication. This order addresses the objections for the exhibits relied on herein. The hearsay objections are overruled, because the exhibits are not being offered in evidence to prove the truth of the matter asserted. *See* FRE 802. Likewise, the relevancy objections are overruled. "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FRE 401. The exhibits are relevant in purportedly showing the connection between Akeson and the anonymous writings.

14

Lastly, Akeson objects on the grounds that plaintiff failed to authenticate the exhibits under FRE 901. Regarding exhibit 2, the anonymous letter to Patty Wedemeyer, plaintiffs have not cited to any part of the record, such as deposition testimony of Wedemeyer, that authenticates it. There is no proof in the summary judgment record that Wedemeyer received the letter, and LaBella is not qualified to authenticate it. Exhibit 5, emails between LaBella and Wedemeyer, does not cure this defect, because those emails are not sworn to by Wedemeyer. Nevertheless, this order will address the merits in regards to exhibit 2 for the sake of completeness, but to enter it as evidence at trial it must be properly authenticated. The record, however, contains deposition testimony that authenticates some of the documents. As to exhibit 4, emails between Cristina Akeson and Harriet Hiebel, are authenticated by Akeson's testimony that she sent the emails (Henning Exh. A 138:23–141:1). For exhibit 5, emails between LaBella and Wedemeyer, the declaration authenticates this exhibit by stating the emails are a true and correct copy of the emails she received. LaBella's deposition testimony authenticates exhibit 3, the anonymous letter to LaBella, because it provides testimony from one with knowledge that the documents are what she claims them to be (LaBella Exh. 8 at 34:5–10).

**B.     Talada's Claims Based on the Anonymous Letter Sent to the Police.**

Talada's only claims remaining against defendant Cristina Akeson include false arrest/imprisonment, intentional infliction of emotional distress, and defamation. These claims primarily stem from Talada's allegations that Akeson sent an anonymous letter to the police falsely identifying him (referred to as "Talapia" in the letter) as the NorCal rapist. But there is no direct evidence that Akeson sent the letter.

In any event, Akeson cannot be held liable for the anonymous informant letter under California Civil Code § 47(b). The California Supreme Court has stated that

> [T]he overwhelming majority of cases conclude that when a citizen contacts law enforcement personnel to report suspected criminal activity and to instigate law enforcement personnel to respond, the communication also enjoys an unqualified privilege under section 47(b). These cases explain that a statement urging law enforcement personnel to investigate another person's suspected violation of criminal law, to apprehend a suspected lawbreaker, or to report a crime to prosecutorial authorities is shielded from tort liability to the same extent as a similar statement to administrative enforcement agencies. Reasoning that

15

> such communications are at least preparatory to any other official proceeding authorized by law, the majority of decisions in the Courts of Appeal have held such statements to be shielded by an absolute privilege.

*Hagberg v. California Federal Bank*, 32 Cal. 4th 350, 364 (2004). "[W]ithout respect to the good faith or malice of the person who made the statement, or whether the statement ostensibly was made in the interest of justice, courts have applied the privilege to eliminate the threat of liability for communications made during all kinds of truth-seeking proceedings: judicial, quasi-judicial, legislative and other official proceedings." *Id.* at 361.

In this action, the anonymous letter was sent to a law enforcement officer (defendant Peterson) to report suspected criminal activity and to instigate law enforcement to respond. This order, therefore, holds that the statements in the anonymous letter fall within the absolute privilege. The statements could only form the basis of tort liability if plaintiffs could establish malicious prosecution. *Id.* at 355. Malicious prosecution is not asserted here. Talada's claim of false arrest/imprisonment solely rests upon his allegation that Akeson sent the anonymous letter to the police identifying him as the NorCal rapist. Even assuming arguendo that she did send the letter, that communication was absolutely privileged under Section 47(b), and the false arrest claim cannot proceed against Akeson. Likewise, to the extent Talada's emotional distress and defamation claims against Akeson also depend on the anonymous letter sent to the police, those claims also cannot go forward.

### C. Talada and LaBella's Claims Based on the Other Anonymous Letters.

That leaves two other anonymous letters that Talada and LaBella rely on for their emotional distress and defamation claims. Similarly, LaBella also asserts those two anonymous letters support her claim for violation of her civil rights under California Civil Code § 52.1. But there is no direct evidence that Akeson sent any anonymous letters. Rather, plaintiffs rely upon circumstantial evidence and inferences.

One of the anonymous letters was addressed and sent to "Patty" (LaBella Exh. 2). Plaintiffs assert this referred to Patty Wedemeyer, LaBella's work supervisor. The letter

1  specifically used LaBella's name and referred to her as an evil instigator, gossiper, manipulator,
2  an angry hater, and mentally screwed up and wasted. It further stated (*ibid.*):

> [h]as Ba T. actually tried to rape the two of you. . . . Do you know that her lazy-boyfriend is a [sic] bad news? They are under investigations for stealing other people's I.D's [sic], theft, fraud, rape, and murder? Computer hackers? She's as vicious as this note reads.

6  According to the representation of plaintiffs' counsel at the hearing, "Ba T." was a supervisor at
7  LaBella's job.

8  Another anonymous letter was sent to LaBella in May 2007. According to plaintiffs, it
9  came by mail in a *Contra Costa County Times* envelope. It consisted of two messages from
10 what appears to be craigslist postings. One of the messages was titled "I know you wrote it"
11 and says "but go ahead and keep lying about it. Your [sic] the only one that believes your lies.
12 Your words have become meaningless. Hope it was worth it!" (LaBella Exh. 3). The second
13 message was titled "My craigslist dreams come true! (santa rosa)" (*ibid.*). That post rambled
14 about meeting for coffee, falling in love, couples sex therapy, and so forth. There are also four
15 pages of news clippings of pictures and words, ranging from "gotcha" to "gets her revenge"
16 (*ibid.*).

17 Although there is no direct evidence implicating Akeson, there are two lines of
18 inferential argument. The first involves the fact that the Akesons threw away their computer's
19 hard drive allegedly used to send the offending correspondence. The Akesons, on the other
20 hand, assert that before the litigation started they replaced the hard drive after it failed. The
21 Court will let this information into evidence for the jury to draw its own inferences. The second
22 inferential argument is based on plaintiffs' contention that a comparison of the anonymous
23 letters and Akeson's emails shows the same "themes, vocabulary, punctuation, and style
24 similarities" (Opp. 3). For example, references to phone numbers left out the parenthesis on the
25 left side of area codes in an email purportedly from Akeson, *i.e.,* "925)516-7188," and in the
26 informant letter, *i.e.,* "925)229-7370" (LaBella Exh. 1, Exh. 4). Admittedly, the anonymous
27 informant letter with the "925)" only went to the police. While that letter cannot support any
28 damages claims, it arguably shows Akeson's unique style of writing area codes and from that

17

the jury could conclude that Akeson wrote the anonymous letter to the police. The jury might then also possibly conclude that Akeson wrote the *other two* anonymous letters in the same period. While the Court may allow the anonymous letter to the police in evidence for this limited purpose, it is highly unlikely that any references to the NorCal rapist will be allowed at trial. The narrow issue will be whether Akeson sent the other two anonymous letters to Wedemeyer and LaBella. Because there is a genuine issue of material fact as to whether Akeson authored the letters, Akeson's motion for summary judgment as to these two anonymous letters is **DENIED**.

### 3. REQUESTS FOR ADMISSION.

Both defendants point out that Talada failed to provide timely responses to their requests for admissions. They argue that under FRCP 36(a)(3) the failure resulted in an automatic admission, particularly an admission that defendants are not liable in this action. This issue was first addressed at a hearing on July 7, 2009, regarding the parties' discovery disputes. To date, plaintiff's have not filed a motion to withdraw or amend the admissions. At the discovery hearing, the Court stated that plaintiffs may file a motion to be relieved from the admissions, and the motion would be heard at the pre-trial conference (Dkt. No. 189 at 13). As such, this issue is premature. In addition, this order has already addressed the merits of defendants' arguments further mooting the issue.

### CONCLUSION

For the reasons stated above, defendant Peterson's motion for summary judgment is **GRANTED** and defendant Akeson's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

Dated: September 4, 2009.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE